### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF ELECTRONIC DEVICES SEIZED BY ROMANIAN POLICE AND STORED AT WASHINGTON FIELD OFFICE OF THE U.S. SECRET SERVICE IN FORENSIC LAB #1, ROOM 4101, 1100 L STREET N.W., WASHINGTON, D.C.** | **SC  No. _____** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT FOR ELECTRONIC DEVICES SEIZED BY ROMANIAN POLICE

I, Special Agent R. Dean Glore, of the United States Secret Service, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for electronic devices seized by Romanian police in Bucharest, Romania from Mihai Alexandru Isvanca (hereinafter "Isvanca") and Eveline Cismaru (hereinafter "Cismaru") and transferred to the United States Secret Service pursuant to a Mutual Legal Assistance Treaty request made by the United States of America to the Government of Romania.  The items are described as follows:

Apple Macbook Pro computer laptop with Serial # C02RR7BAG8WN;

Apple Macbook Pro computer laptop with Serial # C17SQ6V5GVC1;

Apple iPhone Model A1688 (IC:579C-E2946A);

Apple iPhone - Model A1586 (IMEI 352068062047254);

Apple iPhone - Model A1507 (IMEI 358832056045796);

Apple iPhone. Model A1784 (IC:579C-E3092A) With black Givenchy case;

Sandisk USB to iPhone flashdrive;

1

Sim Card 000302949376842C737; and

Sim card 329242854796

These devices are stored at the Washington Field Office of the United States Secret Service, Forensic Lab #1, Room 4101, 1100 L Street, N.W., Washington, D.C., and listed again on Attachment A. The above devices were delivered to an agent of the U.S. Secret Service on March 16, 2018 in Bucharest, Romania and hand carried to the U.S.A. arriving at Dulles Airport, Virginia on or near March 18, 2018. The devices were transferred to Supervisory Special Agent Mark Grantz, of the U.S.S.S., who stored the items at the Washington Field Office of the U.S. Secret Service at the location specified above.

       2.      This affidavit is made in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure. The devices were in the possession of Isvanca and Cismaru, now charged with computer crimes, and likely contain evidence of criminal conduct, are instrumentalities of a crime, contain evidence of acquisition of money and cryptocurrency from fraud, and contain identification information for Isvanca and Cismaru linking them to criminally incriminating emails and email accounts. This search warrant authorizes the Government agents to search for and seize evidence of criminal conduct further described herein (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

       3.      I, R. Dean Glore, am a Special Agent with the United States Secret Service ("USSS"), Washington Field Office ("WFO"), and have been since February 2018. I was previously employed as a Special Agent with the Internal Revenue Service, Criminal Investigation

(IRS-CI) from August 2014 to February 2018. As an IRS-CI Special Agent, my responsibilities included the investigation of the Internal Revenue Code and other related offenses.  Prior to my employment as an IRS-CI special agent, I was employed as a Special Agent for the USSS from March 2003 to August 2014. I have participated in more than 30 search warrants. I have personally conducted and assisted other USSS and IRS-CI Special Agents, as well as other law enforcement officers, in non-tax and tax investigations. I have also participated in witness interviews and investigations involving bank fraud, mail fraud, identity theft fraud, access device fraud, wire fraud, and fraud in connection with computers. During that time, I conducted numerous investigations including, but not limited to, fraud against the United States, and assisted with probable cause searches and arrests applicable to violations of United States, District of Columbia, and state and local laws.

4.      In October 2003, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.  In January 2004, after graduating from the Federal Law Enforcement Training Center, I attended agency specific training at The James J. Rowley Training Center in Beltsville, Maryland

5.      After graduating from The James J. Rowley Training Center, I attended the USSS Basic Computer Evidence Recovery Training, where I received in-depth training related to computer forensics.  In addition, I received training on how to analyze a computer image to discover evidence relevant to an investigation (to include continually evolving, highly technical advanced malware), proper questioning to determine relevant evidence upon analysis of a computer, Internet Protocol ("IP") addressing and internet anonymizers (such as proxies and VPNs).  Additionally I attended Advanced Computer Evidence Recovery Training, where advanced tools and techniques related to computer forensics were taught as well as other specific

training modules.  I received significant training in the investigation of electronic crimes, specifically the forensic analysis of digital evidence including hardware and software techniques.

6.      In December 2014, I also graduated from the IRS-CI Special Agent Investigative Techniques program at the National Criminal Investigation Training Academy (NCITA). In these programs, I studied a variety of law-enforcement-related classes, criminal investigator, and tax crime issues, including constitutional law, search and seizure, violations of the Internal Revenue laws, and Internal Revenue Service procedures and policies in criminal investigations. During this training, I completed classes in the following subject matter areas:  criminal tax issues, money laundering, search and seizure warrants, investigative techniques, methods of proof, and other financial crime related topics.

7.      The facts in this affidavit come from my personal examination of the facts and circumstances, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit there is probable cause to believe that violations of 18 U.S.C. §§ 1030 (fraud in connection with computers), 1343 (wire fraud) and conspiracy under 18 U.S.C. §§ 371 and 1349, have been committed by the defendants Isvanca and Cismaru, and perhaps others.  There is also probably cause to believe that these devices contain evidence of money laundering, and monetary transactions involving criminal proceeds, in violation of 18 U.S.C. § 1956.   There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes as further described in Attachment B.

## JURISDICTION

9.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by Rule 41(b)(1) of the Federal Rules of Criminal Procedure, because the devices subject to search are located within the District of Columbia.  Further, the offenses under investigation are the subject of a continuing grand jury investigation and criminal prosecution (U.S. v. Isvanca and Cismaru, Cr. 18-020(DFL)) in the District of Columbia.

## PROBABLE CAUSE

## PROCEDURAL HISTORY

10.     On December 11, 2017, Isvanca and Cismaru were charged by the filing of a criminal complaint, in Case No. 1:17-MJ-953, with: (1) conspiracy to commit fraud in violation of Title 18, United States Code, Sections 1349 and 1343; and (2) conspiracy to commit unauthorized access of protected computers to commit fraud, to transmit programs to intentionally damage protected computers without authorization and to transmit threats to damage protected computers in order to extort in violation of Title 18, United States Code, Sections 371, 1030(a)(4), 1030(a)(5)(A), 1030(a)(7), 1030(c)(3)(A) and (c)(4).  On December 11, 2017, United States Magistrate Judge for the District of Columbia Robin Meriweather issued a warrant for the arrest of Isvanca and Cismaru based on the charges in the criminal complaint.

11.     Thereafter, the U.S. Department of Justice issued a request to Romanian authorities for a provisional arrest of Isvanca and Cismaru.  The request was based upon information from European law enforcement that the two had left the United Kingdom and returned to their home country, Romania.  On December 15, 2017, Romanian law enforcement arrested the defendants at the airport in Bucharest, as they were about to board a flight leaving Romania.  At the time of their arrest, several devices were seized, including four iPhones and an Apple laptop.  Another Apple

laptop (serial number C02RR7BAG8WN) was recovered a few days later by Romanian police after it was abandoned at or near the seats occupied by the defendants in the airport boarding gate passenger waiting area.  At the time of the request for a provisional arrest, the U.S. Department of Justice had also transmitted a request (through a Mutual Legal Assistance Treaty) for search and seizure of any electronic devices in the possession of the defendants.  Romanian law enforcement recovered items listed in paragraph 1 herein, and delivered them to Special Agent Kimmel who transported them on a flight from Romania to Dulles Airport, Virginia.  Special Agent Kimmel delivered them to other agents of the U.S. Secret Service on March 18, 2018, including Supervisory Special Agent Mark Grantz.  The devices were transported to the U.S. Secret Service, Forensic Lab #1, Room 4101, 1100 L Street, N.W., Washington, D.C. where they remain awaiting a court ruling on the application for a search warrant for the devices.

12.     On January 30, 2018, a grand jury filed an indictment charging Isvanca and Cismaru with the same offenses that were contained in the complaint.  The indictment is filed in the United States of America with the United States District Court for the District of Columbia entitled United States v. Mihai Alexandru Isvanca and Eveline Cismaru, Cr. 18-020(DLF).  The indictment charges the defendants with the following: conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, wire fraud in violation of 18 U.S.C. § 1343, conspiracy to commit computer fraud in violation of 18 U.S.C. § 371, trespassing into a Government computer (otherwise known as unauthorized entry into a computer used by a Government agency), in violation of 18 U.S.C. § 1030(a)(3), unauthorized entry into a computer with intent to defraud, in violation of 18 U.S.C. § 1030(a)(4), intentionally damaging a protected computer, in 18 U.S.C. § 1030(a)(5)(A), threatening to damage a computer with the intent to extort in violation of 18 U.S.C. § 1030(a)(7) and forfeiture of criminal proceeds.

13.     On January 30, 2018, U.S. District Court Magistrate Deborah A. Robinson issued arrest warrants for Isvanca and Cismaru.  Thereafter, the U.S. Department of Justice through the Office of International Affairs, submitted a request to extradite the defendants for trial.  The Romanian courts granted the extradition request as to both defendants.  Isvanca is awaiting an extradition date from the courts in Romania.   Cismaru, appealed her extradition ruling, and the Romanian court affirmed the extradition ruling.  Cismaru had been placed on house arrest awaiting an extradition date of March 14, 2018, but fled the country to avoid extradition to the United States.  Romanian courts issued a warrant for her arrest when she failed to appear in court as required.  On February 27,-28, 2018, Cismaru was detected by border control leaving France and entering the United Kingdom via the Channel Tunnel.   She was traveling with Mattias Clintom (believed to be her common law husband).  She arrived at the Channel Tunnel by train, which departed Budapest, Hungary (not Romania) a day before.   It is apparent that she left Romania, crossed into Hungary and boarded a train in Hungary to avoid detection by Romanian authorities that she was departing their country in violation of Romanian court orders. She entered the United Kingdom in a car that was owned by Clintom's brother.  According Extradition Detective Constable Mark Sasson of the United Kingdom, his team of law enforcement officers located her in London and arrested her the morning of March 23, 2018. When officers knocked on the front door a white male answered, believed to be Clintom.  When he observed police, he closed the door blocking them from entering.  While he blocked the front door, the fugitive Eveline Cismaru fled out the back door.  Police were positioned there in anticipation that she would flee to avoid capture.  They apprehended her as she fled out the back door.  She attempted to smash her phone incident to arrest.

## SUMMARY OF THE EVIDENCE

14.     The following is a summary of the evidence in the case which led to the indictment and which now forms a part of the facts upon which there is probable cause to issue this search warrant.  This prosecution arose from an investigation by the United States Secret Service ("USSS") assisted by the United States Federal Bureau of Investigation ("FBI"), which revealed that from at least January 1, 2017, through December 15, 2017, Isvanca and Cismaru, both citizens of Romania, committed offenses involving unauthorized intrusion into computers connected to surveillance cameras of the Metropolitan Police Department of Washington, D.C., (hereinafter, "Metropolitan Police Department" or "MPDC").  Those computers were and are also used by federal law enforcement agencies like the USSS and the FBI to provide additional security for events held in Washington, D.C.  Isvanca and Cismaru, while in Romania and in the United Kingdom, launched attacks on Metropolitan Police Department computers to insert computer programs known as ransomware.  The ransomware damaged and locked these computers and left a message on the computer screen demanding payment of a ransom in exchange for decrypting and restoring each computer.  The ransomware demands were found on 126 of 187 the Metropolitan Police Departments surveillance camera computers.  The ransom demands totaled $60,000.

### How the Computer Intrusion was Detected

15.     In preparation for the Presidential Inauguration, on or about January 12, 2017, the United States Secret Service ("USSS") learned that a large number MPDC public surveillance cameras in the District of Columbia, had been disabled.  Each disabled camera was controlled by a dedicated computer installed immediately adjacent to the camera and connected to a larger

network and one or more servers operated by MPDC.  The computers are "protected computers" under 18 U.S.C. §1030(e)(2) because the computers are "used in or affect interstate or foreign commerce or communication."  The computers attached to the surveillance cameras are connected to the internet and are capable of being remotely accessed by MPDC or others working with or for MPDC.

16.     On January 12, 2017, an MPDC information technology ("IT") network administrator showed USSS Special Agent Brian Kaiser that the MPDC IT staff was able to use a Remote Desktop Protocol ("RDP"), a standard tool available on nearly all computers running Windows software, to connect with any of the computers operating any of the surveillance cameras and thereby to observe real-time activity on those computers.  Through the use of the RDP, Special Agent Kaiser could observe activity on a selected remote camera computer as if he were sitting in front of a monitor and directly operating that remote computer.

17.     On January 12, 2017, the IT network administrator executed the RDP to access one of the surveillance camera computers (hereinafter referred to as "Victim Device A") on the network.  Victim Device A had a unique network IP address of 166.143.169.96, and was physically located in the District of Columbia.  (An IP address is a unique number used by and/or assigned to a device that is connected to the internet.  Every computer attached to the internet must be assigned an IP address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination.)  Upon execution of the RDP, Special Agent Kaiser personally observed activity on Victim Device A, including multiple open desktop windows on it. The computers were running software programs not installed by, and had files not saved or stored by MPDC,-- all evidence that an intrusion – that is, unauthorized access and control – had occurred.

These desktop windows seen via the RDP had not been opened by MPDC IT staff; rather, they had been opened by subject(s) who had acquired unauthorized access and control of the computer.

18.     The opened desktop windows on Victim Device A included (a) a window displaying a tracking number for the European shipping company known as "Hermes";  (b) a web browser window open to https://app.sendgrid.com showing an activity feed for multiple email addresses; (c) a Google search page with search results for "email verifier online"; (d) a browser window open to emailx.discoveryvip.com; (e) another window for a notepad program showing code for various executable files and text files; and (f) a window showing the splash screen for a variant of ransomware known as "cerber."

19.     Based upon his observations, Special Agent Kaiser concluded that the subject(s) had gained unauthorized access to and control of Victim Device A.  The IT network administrator confirmed that the subject(s) using that computer was/were not authorized to use the computer or the government network.  The subject(s)'s network access was blocked thereafter.

20.     Further investigation and analysis revealed that approximately 126 of the MPDC's 187 outdoor surveillance cameras had been accessed and compromised.  The computers controlling the surveillance cameras were locked and displayed a ransom demand demanding payment to restore operation and recover the files which were now encrypted—according to the message.  Ultimately, three of those computers, including Victim Device A, were removed for forensic analysis by the USSS and the Federal Bureau of Investigation ("FBI").  Since the remaining surveillance computers and cameras were needed for security for the imminent Presidential Inauguration, the other computer hard drives were wiped (erased) and the MPDC reinstalled the original software and returned them to service.  They did not pay any of the ransom demands implanted on the 126 computers.

21.     USSS forensic analysts examined records and system logs recovered from two of the compromised computers, Victim Device A and Victim Device B, and FBI forensic analysts examined records and logs from the third computer, Victim Device C.  Victim Devices B and C were also physically located in the District of Columbia.   The examinations revealed that unauthorized access to and control and use of these three computers by the subject(s) occurred from about January 9 to January 12, 2017.

**Use of Search Warrants to Obtain Subscriber and User Information Lead Back to Isvanca and Cismaru as the Perpetrators of the Computer Hack**

22.     Forensic analysis of the digital evidence on those surveillance camera computers reflects that Isvanca and Cismaru conducted the unauthorized access and control for purposes of installing the ransomware.  They used Victim Device A at least, to implement a fraud scheme, as Device A also revealed evidence of email accounts used by the Isvanca and Cismaru.  The investigation revealed that the perpetrators of the MPD surveillance computer intrusion used a series of email accounts to obfuscate the trail leading back to the actual perpetrators.   For example, subscriber information on one email account lead to another email account as the subscriber rather than the actual subscriber's name.  Investigators probed through a succession of layers of email accounts, finding that each used a moniker by one of the defendants.  Ultimately a combination of analysis of the devices used to open each account (IP addresses), together with analysis of the content of the emails, when combined with analysis of the social accounts of the defendants, (like Facebook), together with evidence about how each account was used (e.g., to register corporations, obtain driver's licenses, book airline reservations, even order pizza deliveries) all presented a powerful circumstantial trail leading back to Isvanca and Cismaru. (Ultimately, when confronted after arrest, Isvanca admitted to the charged conduct and implicated Cismaru as the instigator and co-defendant).

11

23.     The evidence also shows that Isvanca and Cismaru acted in concert to convert at least one of these targeted MPDC computers into a proxy computer, which is identified herein as Victim Device A.   By converting at least one computer into a proxy computer, Isvanca and Cismaru could and did launch additional ransomware, malware and fraud scheme remotely, that is, from Romania or United Kingdom.  The use of one of the Metropolitan Police Department computers as a proxy to send ransomware and malware to other computers made it look, at first glance, like the proxy Metropolitan Police Department computer was the origin of the subsequent ransomware and malware attacks.  Isvanca and Cismaru also used the proxy computer to conduct fraud schemes, including schemes to insert malware programs to steal banking credentials, passwords, and other personal identification information which could be used to open up accounts and fraudulently obtain money and other things of value using the stolen identities of other people.

24.     U.S. law enforcement agents used computer analysis and judicially authorized search warrants to retrieve information from various e-mail accounts used in connection with the fraud scheme.  Analysis also showed how Isvanca and Cismaru used credit card fraud schemes to make money.  One such scheme involved using a Metropolitan Police Department surveillance camera computer bearing internet protocol address 166.143.169.96 (an internet protocol address is a unique address given to a computer connected to the internet), to track the shipping of an item purchased by a legitimate customer in London, England.  The customer is identified here by the initials R.T.  Isvanca and Cismaru used a fraudulent credit card to purchase an item and list if for sale on Amazon .com.  R.T. sought to purchase that item.  Isvanca and Cismaru used the proxy computer 166.143.169.96 to verify the shipping of the product through a commercial common carrier called Hermes.  This was an important step in this particular fraud scheme

12

because Amazon.com, the website hosting the transaction, will not release funds to the seller until it receives the tracking number of the item being shipped to the customer.  This is how Amazon.com assures that the purchaser is going to get the product that they bargained for.  In this transaction, Cismaru used the Metropolitan Police Department computer 166.143.169.96 to ascertain the tracking number of the shipped devices from Hermes.  She then used the proxy computer to advise Amazon.com of the tracking number and thereby confirmed that the product purchased by customer R.T was shipped.  After receipt of the tracking number, Amazon.com released the buyer's funds (R.T.) and transferred those funds to Cismaru, as she was listed as the seller of the device bought by R.T.  The Metropolitan Police Department computer which Isvanca and Cismaru turned into a proxy enabled Isvanca and Cismaru to commit the fraud scheme as if the scheme was perpetrated by the Metropolitan Police Department computer bearing IP address 166.143.169.96.   As a result of the scheme, Cismaru received payment for the item sold to R.T. but incurred no expenses in the transaction because she had used a fraudulent credit card to purchase the item actually sold to R.T. Cismaru was able to profit from the sale of the item without having to spend any of her own funds to acquire the item.  She paid only the costs of shipping the item.

## A.  Summary of Evidence Linking Eveline Cismaru to the Fraud and Ransomware Schemes and Related Computer Intrusion.

25.     The most compelling evidence linking Eveline Cismaru to the criminal activity is that she used her personal email account – eveline.cismaru@gmail.com – in connection with the scheme.  Since she used her Gmail account (Google as the electronic service provider) for personal matters, those links helped establish her as the identity of one of the perpetrators of the scheme, despite the use of layers of other email monikers.  For example, her Google account was

linked to her social media page (Facebook), received invoices for purchases such as airline tickets that contained personal identifying information, made Airbnb queries, made a United Kingdom Driver's license application, was used to make efforts to find a nanny for her three-year-old, and for other personal things and services that require one to reveal their real identity. Such links do not support the assertion that someone had used her account to conduct the fraud and computer intrusion when ultimately, it links back to her real identity.  Use of a false identity for such transactions, like airline tickets, driver's license, would be futile as her face actually matches the identity and name used to get a license to drive, and to get past security to board an aircraft, just to name a few examples.   However, the eveline.cismaru@gmail.com email account when searched also contained evidence of the ransomware and fraud schemes, for example, the same text file containing the 179,616 email addresses found on the MPD computer that had been turned into a proxy, and thousands of stolen credit card numbers were also found by search warrant in her Goggle account.  Additionally, the fraudulent credit card/sales scheme at Amazon referenced above involved the creation of a fake or "shell company" by the name of Lake L. also was found in the Google records.   Records from Amazon indicate that this company was set up in the name of Cismaru and the email address of the company "Lake L," was eveline.cismaru@gmail.com.  In an interview attended by a U.S. Secret Service agent and conducted by Romanian police, on December 20, 2017, Eveline Cismaru denied any involvement in this scheme, and even denied the use of her own personal email account. Evidence in her Gmail account and the Lake L scheme, the use of the email account to get a UK driver's license, the use of the same account to acquire airline tickets and a boarding pass,   are instances in which she would have to reveal her identity, and these instances however, show that her statements to Romanian law enforcement officials were falsely exculpatory.

14

B. __Summary of Evidence Linking Mihai Alexandru Isvanca to the Fraud__
   __and Ransomware Schemes and Related Computer Intrusion.__

26.     Isvanca is also linked to the MPDC computer intrusion charges in the indictment,

Isvanca registered a certain static IP address in Romania in his own name.  The affiant knows

that registration of a static IP address is typical in countries like Romania, because it assures the

registrant of access to the internet when cable access to individual homes and places is not as

common as internet access to individual homes is in the United States.  That IP address was then

used as the terms of service IP address (that is, the IP address at account creation) by various

pseudonymous email accounts that planned and perpetrated the computer intrusion.  In other

words, each email account created with a pseudonym/moniker linked back to the same static IP

address registered to Isvanca.  A search of the various email accounts used in the computer

intrusion scheme contained files that housed the same ransomware that was used to attack the

surveillance camera computers.  Although the layered email scheme already pointed to Isvanca

as the ultimate creator of these accounts, in an interview after his arrest, Isvanca actually

admitted to owning the static IP address used in creating these accounts.   That same static IP

address was important to someone intent on committing computer intrusions because acquisition

of such a static IP address assured him access to the internet wherever he may be.  His creation

of and use of false moniker email accounts did not obfuscate his involvement entirely  because

each false moniker email account created  linked back to that IP address, (which was

automatically disclosed when he created each account)  and that IP address implicates him, not

another, as the real creator behind such emails used in the fraud scheme.  In any event, Isvanca in

the presence of his attorney in Romania, confessed to performing the network intrusion and

admitted he did so along with Cismaru, (a friend of his since high school).  Also, Isvanca

admitted to using the email addresses associated with the intrusion, along with Cismaru.  It

15

should be noted that in that same December 20, 2017 interview, he denied infecting the

computers with the ransomware even though his static IP address linked him as the originator of

the attack.   In the same interview, Isvanca admitted to the fraudulent credit card/sales scheme at

Amazon which he and Cismaru accomplished in part using Metropolitan Police Department

surveillance camera computer identified as Victim Device A.  The statement he initially made

was partly incriminatory and partly false exculpatory, as months later, on March 5, 2018, Isvanca

in the presence of his U.S.A. attorney, admitted that in fact, he and Cismaru installed the

ransomware found on the MPD surveillance camera computers.  He explained that he and

Cismaru worked together but that Cismaru was the instigator of the scheme and that he helped

implement and execute it.

### C.  Summary of Use of Email Accounts.

27.     Prior to Isvanca's incriminating admissions however, independent of his

statement on December 20, law enforcement had amassed a strong circumstantial body of

evidence through a series of email search warrants, that ultimately led to Isvanca and Cismaru as

perpetrators of this computer intrusion, ransomware and fraud scheme.    Forensic analysis of

Victim Device A determined that multiple email accounts had been accessed while the computer

was under the control of the subject(s) between January 9 and January 12, 2017.  Two such

accounts were **david.andrews2005@gmail.com** and **anonimano027@gmail.com**.  Google

records revealed that **anonimano027@gmail.com** had sent and received multiple emails with

another account, **vand.suflete@gmail.com**.  ("Vand Suflete" translates from Romanian to

English as "selling souls.")  From my training and experience, individuals will use multiple

email addresses so that criminal activities are not exposed or easily traced back to the originating

person.  One set of email correspondence appears to consist of a test email on January 10, 2017,

consisting of the subject line "x."   In my training and experience, cyber criminals will send test emails to ensure they are communicating with the correct account. Once they verify they are communicating with the correct account they will then send the information involved in or derived from the computer intrusion.  These test emails were followed by another email on January 10 from **vand.suflete@gmail.com** to **anonimano027@gmail.com** that included the IP addresses, usernames, and passwords for 94 of the IP addresses for MPDC surveillance camera computers confirmed to have been accessed and compromised, and additional IPs which appear to be on the same network.

28.     From my training and experience, I know that individuals will sometimes log into other IP addresses using that IP address' username and password, to create a degree of separation through a proxy server, thus making the criminal actions done on the IP address more difficult to be tracked back to them.  In the email, listed next to various of the aforementioned IP addresses were the following (a) a reference to "cerber," a sophisticated form of ransomware; (b) "ars," a Romanian word for "burnt"; and "aici," a Romanian word for "here." "Aici" was listed next to the IP address 166.143.169.96, the IP address of Victim Device A.   An email from **vand.suflete@gmail.com** to **anonimano027@gmail.com** identified various computers by IP address, with corresponding usernames and passwords, which had been infected with or contained the code for the cerber variant of ransomware.    Google Search warrant records for **vand.suflete@gmail.com** included an email with what is believed to be a link to a "cerber control panel."   A cerber control panel is a website that allows a cerber affiliate (a variant of the ransomware installed on the MPDC computers) to control the cerber framework without having access to the source code, thereby allowing the owner and creator to retain for themselves the intellectual property of the malware and thus to generate additional income from other affiliates.

17

29.     Google records for **vand.suflete@gmail.com also** included multiple email exchanges with **eveline.cismaru@gmail.com**.     In one such email exchange, **eveline.cismaru@gmail.com** sent an email to **vand.suflete@gmail.com** containing an individual's personal identifying information, including a full name, a physical address, and an email address; in a reply email, **vand.suflete@gmail.com** account stated, "succes parola la cont pe site e," which roughly translates from Romanian to English as "successful password to your account on the site is," followed by what appears to be a password.  In addition, there are multiple emails sent from **vand.suflete@gmail.com** to **eveline.cismaru@gmail.com** containing IP addresses and what appear to be usernames and passwords for a given IP address. This is similar in style to the January 10 email from **vand.suflete@gmail.com** to **anonimano027@gmail.com** which included the IP addresses, usernames, and passwords for 94 of the IP addresses for MPDC surveillance camera computers.   Google records for **eveline.cismaru@gmail.com** included a January 10, 2017, email sent to **david.andrews2005@gmail.com** containing the file USA.txt, which had been previously forwarded by suhm2006@hotmail.com on January 9, 2017.  As noted above, the file USA.txt (containing 179,616 email addresses) was also found on Victim Device A. The MD5 checksum calculated on the USA.txt file located on Victim Device A matches the MD5 checksum calculated on the USA.txt file found in the **eveline.cismaru@gmail.com** account. A checksum is a computer algorithm run by forensic analysts on two or more files found in an investigation in order to determine if they match. Since a checksum algorithm will output a significantly different value if the input is changed, the checksum can be used to determine if the file or files found on separate pieces of evidence are the same file or have been modified. Generally, changing the name of a file will not affect the file's checksum value, while changing

the contents inside the file will.  In laymen's term, the match here means that the USA.txt file is the exact same file on Victim Device A as found in the **eveline.cismaru@gmail.com** account.

30.     Google records for these accounts also included several emails sending and receiving credit card information. In various emails, **amisvanca@gmail.com** sent and/or received information pertaining to approximately 1,603 credit cards; **eveline.cismaru@gmail.com** sent and/or received information pertaining to approximately 2,170 credit cards; and **vand.suflete@gmail.com** sent and/or received information pertaining to approximately 55 credit cards.  Thus such evidence demonstrates their purpose of committing a fraud scheme not just a ransomware scheme.

31.     The interlocking nature of these emails, the creation of these email accounts traced to the same IP address (statis IP address linked to Isvanca), the fact that search warrant evidence of these email accounts found evidence which linked them back to the MPDC surveillance computer intrusion and Victim Device A (used by the perpetrators as a proxy), the use of the accounts to store and exchange stolen credit card and personally identifying information, including banking credentials, show that the defendants were using computers, lap tops or other electronic devices to manage and control this computer intrusion and fraud scheme.  Evidence of access to these various email accounts are likely stored on the electronic devices like laptops and i-phones used to facilitate the criminal activity.  Evidence of monetary transactions, credit card transactions, including cryptocurrency transactions, are also likely to be stored on the devices found in the possession of the defendants Isvanca and Cismaru when they were apprehended by Romanian police on December 15, 2017.

## **CONCLUSION**

32.     Based on the forgoing, I request that the Court issue the proposed search warrant and that there exists probably cause to permit the execution of the requested warrant at any time in the day or night as the devices are in the exclusive possession of the United States Secret Service here in Washington, D.C.

Respectfully submitted,

_____
R. Dean Glore, Special Agent
U.S. Secret Service

Subscribed and sworn to before me on _____, 2018

_____
DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE
 FOR THE DISTRICT OF COLUMBIA